OPINION OF THE COURT
Charles Edward Ramos, J.
Defendants Philip Morris, Inc., R.J. Reynolds Tobacco Co., RJR Nabisco Holding Corp., RJR Nabisco, Inc., American Tobacco Company, Brown & Williamson Tobacco Corp., B.A.T. Industries, PLC, British American Tobacco Company, Ltd., Liggett & Myers Inc., Lorillard Tobacco Co., Inc., United States Tobacco Co., The Council for Tobacco Research-U.S.A., Inc., The Tobacco Institute, Inc., Smokeless Tobacco Council, Inc., and Hill & Knowlton, Inc. (collectively, Defendants) move to dismiss the instant action (1) pursuant to CPLR 3211 (a) (7) *641 for failure to state a cause of action; (2) pursuant to CPLR 3211 (a) (5) on Statute of Limitations grounds; and (3) pursuant to CPLR 3211 (a) (10) for failure to join necessary parties.[1] In addition, defendant B.A.T. Industries, PLC (B.A.T.) moves to dismiss the action as against it on the ground that there is a lack of personal jurisdiction.
Background
These related tobacco litigation actions are brought by 14 different health and welfare benefit trust funds that operate in New York State (collectively, the Funds).[2] The Funds provide health care benefits for employees covered by collective bargaining agreements with various employers. The Funds operate subject to the Taffc-Hartley Act (29 USC § 141 et seq.) and the Employee Retirement Income Security Act (29 USC § 1001 et seq. [ERISA]). Pursuant to these statutes, the Funds’ assets are held in trust for the purpose of providing benefits to participants and beneficiaries.
In bringing this litigation, the Funds seek to recover money the Funds paid for medical bills incurred by their participants and beneficiaries who suffer from alleged tobacco-caused diseases. These actions are based upon the allegations that Defendants (1) deliberately deceived and misled, and continue to deceive and mislead, the Funds, the participants, and their beneficiaries concerning the adverse health consequences of tobacco products; (2) secretly manipulated and continue to manipulate the nicotine levels in tobacco products to insure addiction; and (3) continue to conspire to keep safer tobacco products from the Funds’ participants and beneficiaries.[3]
The first 12 causes of action, alleging torts committed directly against the Funds themselves, are fraud, antitrust violations, deceptive trade practices, false advertising, intentional and *642 negligent breach of special duty, negligence, negligent product design, strict liability, negligent and intentional entrustment, indemnity, and public nuisance. The Funds claim that the Defendants’ alleged conduct regarding tobacco use resulted in the Funds’ failure to take actions to discourage smoking. To the extent that the participants or beneficiaries would seek re-compensation for medical benefits paid, the Funds assert a subrogation claim in their 13th cause of action.
After the Funds filed their complaints, Defendants removed the case to the United States District Court for the Southern District of New York on the ground, inter alia, that the Funds’ subrogation claim arose under federal law. The federal court granted the Funds’ motion to remand the case to this Court, accepting the Funds’ representation that their complaint relies solely on state law. (See, Eastern States Health & Welfare Fund v Philip Morris, Inc., 11 F Supp 2d 384, 399 [SD NY 1998].) The instant motions followed.
Discussion
In now moving to dismiss the action, Defendants put forth a panoply of arguments. The first contention is that the Funds’ 1st through 12th causes of action fail to state a cause of action due to a lack of proximate cause, as the injuries allegedly suffered by the Funds are remote and indirect. Accordingly, Defendants contend the Funds have no rights of action. As for the subrogation cause of action, Defendants argue that because the Funds are ERISA plans, the rights of the Funds are governed by federal law, and any state law subrogation claims are thus preempted.
The Funds contend that their first 12 causes of action do not assert that their participants and beneficiaries have been victimized by Defendants’ alleged fraud, but that the Funds themselves have suffered damages as a result of the alleged deceptive practices. The Funds claim the Defendants injured them by virtue of their public statements, in that the Funds suffered their own economic injuries. As for the subrogation cause of action, the Funds assert that broad preemption principles have no applicability.
Defendants also move to dismiss the actions on the ground that the applicable Statutes of Limitations preclude or severely limit the claims asserted by the Funds, as the national media, the New York media, and the federal government have extensively chronicled the alleged health risks associated with smoking for more than one century. The Funds counter that *643 pursuant to the doctrine of continuing wrong, the Statute of Limitations has not run, as Defendants continue to deceive and mislead the general public as to the health risks associated with tobacco products.
The third ground upon which Defendants move to dismiss is failure to join as necessary parties the insurance companies who may have been paid by the Funds, the employers whose contributions funded the Funds’ payments of medical expenses, and the participants and beneficiaries of the Funds. Defendants maintain there is a genuine risk of duplicative claims and multiple payments if the claims are not joined. The Funds maintain that predictions of future litigation are merely speculation and that, in any event, CPLR 4545 permits awards to be reduced if there has been recovery from a collateral source.
The final motion, brought by B.A.T., claims a lack of personal jurisdiction. The Funds maintain B.A.T. waived objections to jurisdiction by removing the actions to federal court and joining in the opposition to remand. In any event, the Funds contend there are sufficient contacts to establish personal jurisdiction.
A. Failure to State a Cause of Action
It is well established that in determining whether to grant a motion to dismiss based upon a failure to state a cause of action, “the pleadings must be liberally construed and the facts alleged accepted as true; the court must determine ‘only whether the facts as alleged fit within any cognizable legal theory.’” (Wiener v Lazard Freres & Co., 241 AD2d 114, 120 [1st Dept 1998], quoting Leon v Martinez, 84 NY2d 83, 87-88 [1994].) This test is so liberal that the standard is simply whether the plaintiff has a cause of action, not even whether one has been stated. (Id.) “[I]n the absence of proof that an alleged material fact is untrue or beyond significant dispute,” a court may not dismiss the complaint. (Wall St. Assocs. v Brodsky, 257 AD2d 526, 526-527 [1st Dept 1999].)
When considering evidentiary material, “the criterion is whether the proponent of the pleading has a cause of action, not whether he has stated one, and, unless it has been shown that a material fact as claimed by the pleader to be one is not a fact at all and unless it can be said that no significant dispute exists regarding it, again dismissal should not eventuate.” (Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977] [citations omitted].) However, where the allegations consist of claims that are flatly contradicted by documentary evidence, the al *644 legations are not entitled, to consideration. (Herman v Greenberg, 221 AD2d 251 [1st Dept 1995].)
1. Proximate Cause
This Court does not consider these claims in a vacuum, as numerous courts nationwide have considered causes of action identical to those now at hand. Indeed, as has been repeatedly stated in similar litigations across the country, the hurdle the Funds must now overcome at this early stage is a showing of proximate cause. The Court’s role in answering such an inquiry is not an easy task. As the Second Circuit recently stated when analyzing proximate cause, “no topic is subject to more disagreement or such confusion.” (Laborers Local 17 Health & Benefit Fund v Philip Morris, Inc., 191 F3d 229, 235 [2d Cir 1999], cert denied 528 US 1080 [2000].)
The task is made difficult largely due to the inherent arbitrariness in determining exactly at what point liability terminates. (See, Palsgraf v Long Is. R. R. Co., 248 NY 339, 352 [1928] [“because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point”] [Andrews, J., dissenting].) Nevertheless, case law requires a plaintiff to meet a certain standard to establish proximate cause. Although “a variety of factors may be relevant in assessing legal [proximate] cause,” to plead a prima facie case a plaintiff is generally required to “show that the defendant’s negligence was a substantial cause of the events which produced the injury.” (Derdiarian v Felix Contr. Corp., 51 NY2d 308, 314-315, 315 [1980].)
The Supreme Court has outlined three factors why a direct relationship between a defendant’s conduct and a plaintiffs injury is required: (1) the more remote the injury, the more difficult it is to determine the amount of damages attributable to the defendant’s acts; (2) permitting indirectly injured plaintiffs to proceed creates the risk of duplicative recoveries and complicates rules apportioning damages; and (3) individuals who are directly injured are better suited to seek recovery than those with more remote injuries. (Holmes v Securities Investor Protection Corp., 503 US 258, 269-270 [1992].) Accordingly, “a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant’s acts was generally said to stand at too remote a distance to recover.” (Id. at 268-269.)
In the instant case, the Funds maintain they suffered eco *645 nomic harm due to the alleged misrepresentations and fraudulent conduct on the part of the Defendants, and they seek to recover the amounts which they expended. What cannot be denied, however, is that any economic harm suffered by the Funds would not have occurred absent any injury to the smokers. In other words, without the smokers suffering any injury, the Funds would not have incurred the additional expenses it now seeks to recover. Due to this underlying premise, there can be no direct link between the alleged misconduct of Defendants and the alleged damage to the Funds, as the damage to the Funds is remote, indirect, and derivative of third parties.
Courts nationwide have reached identical conclusions. As the Second Circuit recognized in a similar action brought by labor union health and welfare trust funds, the “damages are entirely derivative of the harm suffered by plan participants as a result of using tobacco products. Without injury to the individual smokers, the Funds would not have incurred any increased costs in the form of the payment of benefits, nor would they have experienced the difficulties of cost prediction and control that constituted the crux of their infrastructure harms. Being purely contingent on harm to third parties, these injuries are indirect.” (Laborers Local 17 Health & Benefit Fund, supra, 191 F3d, at 239; see also, Texas Carpenters Health Benefit Fund v Philip Morris Inc., 199 F3d 788, 790 [5th Cir 2000] [loss suffered is too remote to justify direct recovery by the Funds]; International Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v Philip Morris Inc., 196 F3d 818, 825 [7th Cir 1999] [“The injury for which the plaintiffs seek compensation is remote indeed, the chain of causation long, the risk of double recovery palpable”]; Oregon Laborers-Empl. Health & Welfare Trust Fund v Philip Morris Inc., 185 F3d 957, 963 [9th Cir 1999], cert denied 528 US 1075 [2000] [uall of plaintiffs’ claims rely on alleged injury to smokers — without any injury to smokers, plaintiffs would not have incurred the additional expenses in paying for the medical expenses of those smokers. Thus, there is no ‘direct’ link between the alleged misconduct of defendants and the alleged damage to plaintiffs”]; Steamfitters Local Union No. 420 Welfare Fund v Philip Morris, Inc., 171 F3d 912, 928 [3d Cir 1999], cert denied 528 US 1105 [2000] [“we find that however plaintiffs characterize their claims — as direct or indirect — they necessarily fail for being *646 too remotely connected in the causal chain from any wrongdoing on defendants4 5 part55].)[4]
These principles are not novel or innovative; rather, for more than one century, state and federal courts have adopted the theory that the victim of a tort is the appropriate plaintiff and that third-party providers of medical care may recover only pursuant to rights of subrogation. (See, United States v Standard Oil Co., 332 US 301 [1947] [only Congress may authorize a direct claim by the United States to recover the cost of medical care provided to soldiers]; Mobile Life Ins. Co. v Brame, 95 US 754, 758 [1877] [“The relation between the insurance company and McLemore, the deceased, was created by a contract between them, to which Brame was not a party. The injury inflicted by him was upon McLemore, against his personal rights; that it happened to injure the plaintiff was an incidental circumstance, a remote and indirect result, not necessarily or legitimately resulting from the act of killing55]; Anthony v Slaid, 52 Mass 290 [1846] [plaintiff, an individual who contracted to support the poor in a town, could not bring an action against an individual who assaulted and beat one of the beneficiaries for medical costs, as “(t)he damage is too remote and indirect55].)
Were this Court to rule otherwise, the basic theory of proximate cause would be turned on its head, resulting in remote plaintiffs making claims against defendants with whom there is an absolute lack of privity. Take the example of a Funds’ participant who suffered injuries in a defective automobile. If the vehicle in question was manufactured by a company that misled the public as to the safety of its product, under the Funds’ theory not only would the participant be entitled to sue the company, but the Funds would as well. Like the present case, the Funds could argue that the alleged deceptive sales practices resulted in the Funds paying for medical expenses that could have been avoided. Such a scenario would result in a party too remote from the alleged wrongdoing — the Funds— attempting to recover against the automobile company.[5] To allow the Funds to maintain actions that are entirely dependent *647 upon harm suffered by others would cause chaos in the judicial system, especially in light of the fact that the participants and beneficiaries could bring suits on their own behalf. Moreover, permitting the Funds to become primary claimants would conceivably result in a payor obtaining priority over the allegedly injured claimants.
The Court is well aware of Judge Weinstein’s decisions in National Asbestos Workers Med. Fund v Philip Morris, Inc. and Blue Cross & Blue Shield v Philip Morris, Inc. (both reported at 74 F Supp 2d 221 [ED NY 1999]). Although Judge Weinstein permitted both actions to proceed, despite the Second Circuit’s decision in Laborers Local 17 Health & Benefit Fund (supra), this Court does not find his analysis persuasive or applicable.
In mating a distinction between the plaintiffs in Blue Cross & Blue Shield and those in Laborers Local 17 Health & Benefit Fund, Judge Weinstein cited a number of unique features of the Blue Cross plaintiffs and their injuries. These include that the Blue Cross plaintiffs, as medical provider plans, “play a far more active and direct role in the provision of health care to the general public than do traditional insurers,” that “[i]njury to the Blues was allegedly more foreseeable, and allegedly more calculated as part of the defendants’ racketeering scheme, because of the Blues’ dominant and highly visible role as health care providers throughout the nation,” and that “[t]he Blues’ dominant and central role as providers of health care coverage might also simplify the apportionment of damages.” (Id. at 226-227.) None of these factors apply to the Funds. Rather, the Funds are more similar to the plaintiffs in National Asbestos Workers Med. Fund. (See, id. at 224 [the National Asbestos plaintiffs “are self-insured ERISA trust funds which provide health care benefits to union workers in the building trades”].) In this regard, Judge Weinstein acknowledged, “[i]n the case of National Asbestos, there are few features distinguishing it from Laborers Local 17.” (Id. at 228.) Accordingly, this Court does not find that Judge Weinstein’s decisions warrant a different outcome. The Court further notes that one court has referred to Judge Weinstein’s opinion as “a thinly disguised refusal to accept and follow the second circuit’s holding.” (International Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund, supra, 196 F3d, at 827.)
*648 This Court is also familiar with Judge Kessler’s decision in Service Empls. Intl. Union Health & Welfare Fund v Philip Morris Inc. (83 F Supp 2d 70 [D DC 1999]), which denied a motion to dismiss the plaintiffs’ claims. In deciding the case contrary to the precedents of the Second, Third, Seventh, and Ninth Circuits, and numerous District Court decisions, Judge Kessler determined that “their rulings underestimate the inherent ability and flexibility of our common-law based legal system to respond to the demands of a case as difficult as this.” (Id. at 79-80 [footnote omitted].)
For the reasons already discussed, this Court takes a different view. Furthermore, unlike the situation in Service Empls. Intl. Union Health & Welfare Fund, where the District Court noted, “[s]ince our Court of Appeals has not yet had an opportunity to grapple with these questions, this Court writes on a clean slate until our Circuit speaks” (id. at 79), the Second Circuit has issued a ruling. Although this Court is not bound by the decisions of the Second Circuit (see, Flanagan v Prudential-Bache Sec., 67 NY2d 500, 506 [1986], cert denied 479 US 931 [1986]), this Court finds the decision in Laborers Local 17 Health & Benefit Fund persuasive. Notably, a decision contrary to Judge Kessler’s was subsequently reached by another judge in the District of Columbia Circuit. (See, In re Tobacco/Governmental Health Care Costs Litig., 83 F Supp 125, 129 [D DC 1999] [dismissing suit brought by Republic of Guatemala against tobacco companies for costs incurred in treating its citizens’ smoking-related illnesses, as “(c)asting the complaint in language that alleges a direct harm to Guatemala does not alter the derivative nature of the injury actually claimed”].)
Although the Funds maintain that they did not take steps to appropriately treat tobacco-related health problems or discourage smoking due to Defendants’ alleged misrepresentations and omissions, the Court is skeptical of what, if anything, the Funds could have done absent the alleged misconduct. It is unclear what the Funds would or could have done had they been told all the information they claimed they were deceived about. (See, International Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund, supra, 196 F3d, at 826 [“The insurers now have all the information they say they lacked years ago, but what reason have we to believe that this knowledge by insurers has affected cigarette consumption?”]; Laborers Local 17 Health & Benefit Fund, supra, 191 F3d, at 239-240 [“(T)he damage claims here are incredibly speculative. It will be virtu *649 ally impossible for plaintiffs to prove with any certainty: (1) the effect any smoking cessation programs or incentives would have had on the number of smokers among the plan beneficiaries; (2) the countereffect that the tobacco companies’ direct fraud would have had on the smokers, despite the best efforts of the Funds; and (3) other reasons why individual smokers would continue smoking, even after having been informed of the dangers of smoking and having been offered smoking cessation programs”]; Steamfitters Local Union No. 420 Welfare Fund, supra, 171 F3d, at 928 [“In the present case, plaintiffs’ direct-injury claim is that the tobacco companies fraudulently induced the Funds to not spend money (on safer-smoking or smoking-cessation products) that, if spent, would have diminished a separate revenue stream (i.e., smokers’ purchase of tobacco products) for the defendants. We view this as an indirect connection”].)
The Court cannot help but note the fact that the recent massive settlement between the tobacco companies and 46 State Attorneys General on behalf of their states seems to contradict the finding of a lack of direct injury. In the settlement, the states received more than $200 billion over the course of a 25-year period in reimbursement for payments incurred in the treatment of alleged tobacco-related illnesses. Arguably, the instant actions seek the same type of relief — reimbursement for funds expended in treating alleged smoking-related illnesses caused by a third party.
But the distinction between the instant case and that involving the states — and a crucial one — is that the litigation involving the states ended in a settlement. The terms of a settlement reached in one litigation are not binding to subsequent actions. There could be any number of reasons why Defendants chose to settle with the states in actions seeking reimbursement for medical treatment. It is not for the Court, however, to speculate on the reasons parties agreed to a settlement. Rather, as the law clearly requires a showing of proximate cause for the Funds to recover, and as such a showing has not been made, dismissal is appropriate.
2. Subrogation
Remaining before the Court is the 13th cause of action, in which the Funds assert a cause of action for subrogation of the tort claims which their participants and beneficiaries could assert against Defendants. Defendants contend that the Funds stated in federal court that the subrogation cause of action is based solely on state law. Defendants claim that because the *650 Funds at issue are ERISA plans, the rights are governed by federal law and thus preempted. The Funds counter that broad preemption principles have no applicability, as there is no common-law rule of subrogation in ERISA cases.
Under the principle of subrogation, “an insurer, having paid losses of its insured, is placed in the position of its insured so that it may recover from the third party legally responsible for the loss.” (Winkelmann v Excelsior Ins. Co., 85 NY2d 577, 581 [1995]; see also, Pennsylvania Gen. Ins. Co. v Austin Powder Co., 68 NY2d 465, 471 [1986] [subrogation entitles an insurer to seek indemnification from third parties whose wrongdoing has caused a loss for which the insurer is bound to reimburse].) Thus, subrogation is a procedural device whereby one party is substituted for another.
As correctly stated by Defendants, the Funds asserted in federal court, in the context of a motion to remand, that their subrogation rights and subrogation claims are based exclusively upon state law. (See, Eastern States Health & Welfare Fund, supra, 11 F Supp 2d, at 392 [“any ambiguity has been resolved by the plaintiffs’ moving papers and the assertions of plaintiffs’ counsel to this Court that they are expressly relying solely upon state law for their subrogation rights and foregoing any subrogation claims they may have under federal law”].) In fact, in response to a question from the federal judge inquiring if the Funds were forever foregoing their federal subrogation rights in this litigation, counsel for the Funds responded in the affirmative. (Id. at 392-393.) Accordingly, it is no surprise that the federal court concluded the complaint asserted only a claim for subrogation under New York state law. (Id. at 393-394.) Nevertheless, the federal court recognized the danger the Funds put themselves in by advancing this argument: “[Defendants] may be quite right that New York law rules on these questions are preempted by ERISA.” (Id. at 395; see also, id. at 402 [“the price the Funds pay to avoid a federal forum is, of course, reliance upon state law and the not inconsiderable risk here that their state law subrogation claim will be swept away by ERISA’s broad preemptive power”].)
In determining whether a claim is preempted, a court’s task is to ascertain congressional intent in enacting the federal statute. (Metropolitan Life Ins. Co. v Massachusetts, 471 US 724, 738 [1985].) In enacting ERISA, Congress set out:
“to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial *651 burden of complying with conflicting directives among States or between States and the Federal Government * * * [and to prevent] the potential for conflict in substantive law * * * requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.” (New York State Conference of Blue Cross & Blue Shield Plans v Travelers Ins. Co., 514 US 645, 656-657 [1995], quoting Ingersoll-Rand Co. v McClendon, 498 US 133, 142 [1990].)
Accordingly, ERISA contains a preemption provision providing that the statute “shall supersede any and all State laws insofar as they may now or hereafter relate to * * * employee benefit plants].” (29 USC § 1144 [a].) As this provision is construed broadly (Pilot Life Ins. Co. v Dedeaux, 481 US 41, 47 [1987]), and is “conspicuous for its breadth” (FMC Corp. v Holliday, 498 US 52, 58 [1990]), a state law is found to relate to employee benefit plans if it “refers to or has a connection with covered benefit plans * * * even if the law is not specifically designed to affect such plans, or the effect is only indirect,’ * * * and even if the law is 'consistent with ERISA’s substantive requirements.’ ” (District of Columbia v Greater Washington Bd. of Trade, 506 US 125, 129-130 [1992] [internal citations omitted]; see also, Romney v Lin, 94 F3d 74, 78 [2d Cir 1996], cert denied 522 US 906 [1997] [“The preemption language of ERISA * * * is purposefully sweeping”].)
This is not to say that the question of whether a state law is connected with ERISA is to be carried to infinite limits. To fall within the orbit of ERISA’s preemption clause, the state law must be related to ERISA in an aspect that affects ERISA’s objectives. (See, New York State Conference of Blue Cross, supra, 514 US, at 662.) Accordingly, where the state actions that affect employee benefit plans are tenuous, remote, or peripheral, a finding that the law “relates to” the plan is not warranted. (Shaw v Delta Air Lines, 463 US 85, 100, n 21 [1983].)
Defendants assert that the subrogation cause of action is preempted because any claim seeking restitution for medical benefits would “relate to” the plan. Defendants paint too broad a picture of preemption. Notably, although early attempts by the Supreme Court interpreting ERISA’s preemption clause relied heavily upon textual analysis and a dictionary definition of “relate to,” the Supreme Court’s more recent decisions on this subject “have moved away from this form of 'uncritical literalism.’ ” (Plumbing Indus. Bd., Plumbing Local Union No. *652 1 v Howell Co., 126 F3d 61, 66 [2d Cir 1997], quoting California Div. of Labor Stds. Enforcement v Dillingham Constr., 519 US 316, 325 [1997], citing New York State Conference of Blue Cross, supra, 514 US, at 656.) This pattern arises from the belief that if the “relate to” language were read literally, “ ‘preemption would never run its course,’ because ‘[r]eally, universally, relations stop nowhere.’ ” (Plumbing Indus. Bd., Plumbing Local Union No. 1, supra, 126 F3d, at 66, quoting New York State Conference of Blue Cross, supra, 514 US, at 655.)
In the instant case, the subrogation cause of action is based upon tort claims which the Funds’ participants and beneficiaries could assert against Defendants. Such common-law tort claims would not compromise the purpose of Congress in enacting ERISA nor impede federal control over the regulation of employee benefit plans. As stated by the Second Circuit, “[t]o the contrary, ‘insuring the honest administration of financially sound plans’ is critical to the accomplishment of ERISA’s mission.” (Geller v County Line Auto Sales, 86 F3d 18, 23 [2d Cir 1996], quoting Pompano v Schiavone & Sons, 680 F2d 911, 914 [2d Cir], cert denied 459 US 1039 [1982].) Furthermore, the essence of the Funds’ claim is that the Defendants deceived and misled the Funds and its participants; the Funds’ claim does not concern the operation or management of the Funds. Thus, the Funds’ claims do not interfere with ERISA’s intent. (See, New York State Conference of Blue Cross, supra, 514 US, at 657 [“The basic thrust of the pre-emption clause, then, was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans”].) As “[t]he plan was only the context in which this garden variety [alleged] fraud occurred” (Geller, at 23), the Court determines that the subrogation cause of action is not preempted by ERISA. (See, Geller, supra, 86 F3d, at 22 [“the intent of Congress ‘was not to foreclose every state action with a conceivable effect upon ERISA plans, but to maintain exclusive federal control over the regulation of such plans’ ”], quoting New York State Health Maintenance Org. Conference v Curiale, 64 F3d 794, 803 [2d Cir 1995] [emphasis added].)
Unfortunately for the Funds, the fact that the Court finds the subrogation cause of action is not preempted does not lead to the conclusion that the litigation should not be dismissed, as the Funds have failed to sufficiently allege facts entitling them to recover on behalf of the participants and beneficiaries. The Funds have not only neglected to identify the participants and beneficiaries to whose claims they are subrogated, but they *653 have also omitted facts which, if proven, would establish liability on Defendants’ part. Without ascertaining what the specific injuries are for each person, and without the ability to demonstrate what other factors may have caused the injuries, Defendants cannot fairly defend the Funds’ claims. (See, Zemo v County Trust Co., 133 NYS2d 291, 293 [Sup Ct, Westchester County 1954] [“The general rule is that the complaint of one claiming to be entitled to recover because he is subrogated to the rights of another should clearly and distinctly state the facts which show the subrogation”], citing 83 CJS, Subrogation § 68, at 720.)
Although the instant litigation is not formally a class action, the Funds face similar hurdles. Defendants cannot escape the fact that numerous individual issues predominate: whether each beneficiary and participant (1) was nicotine dependent, (2) knew or relied on the alleged misrepresentations, and (3) suffered injury. (See, Small v Lorillard Tobacco Co., 252 AD2d 1, 8 [1st Dept 1998], affd 94 NY2d 43 [1999].) Furthermore, as stated by the Appellate Division in Small, “Defendants have a due process right to cross-examine” each individual. (Id. at 12.) Without greater detail specifying each participant’s or beneficiary’s claim, Defendants are unable to conduct an individual analysis and adequately defend the subrogation cause of action. (See, City of Birmingham v American Tobacco Co., 10 F Supp 2d 1257, 1261 [ND Ala 1998] [finding complaint “is far too vague to serve as the foundation for such a subrogation action”].) Moreover, due to the fact that information about nicotine was widespread for decades, as discussed below, individualized inquiry is necessary to determine any liability. (See, Small, supra, 252 AD2d, at 10 [“At the least, this widely available information about nicotine forecloses any presumption of reliance and requires individualized inquiry into whether particular class members were unaware of such information”].) Accordingly, the 13th cause of action cannot stand. B. Statute of Limitations
Defendants also move to dismiss the actions on the basis of Statute of Limitations. Defendants cite to the fact that allegations identical to those pleaded in the complaints have been publicly disseminated for decades. Although the Defendants do not admit the veracity of such allegations, Defendants extensively chronicle the tremendous and voluminous number of published studies and articles detailing the health risks associated with smoking. Accordingly, Defendants maintain, the Funds were put on notice of the alleged dangers years ago, and therefore failed to timely file these actions.
*654 The Court recognizes the irony of such an argument. For decades, the tobacco industry’s stance on health and tobacco was less than forthcoming, to say the least. (See, Small, supra, 252 AD2d, at 9 [“Long before 1994, the tobacco companies’ position on addiction was discredited by public health experts”]; id. [“The objectivity of [The Council for Tobacco Research] and [The Tobacco Institute] has been severely questioned”]; id. at 10 [cigarette manufacturers’ practice of adjusting nicotine levels was “duplicitous”].) Nevertheless, the fact remains that the alleged dangers of smoking have been publicized and known to the general public for more than one century. (See, Austin v Tennessee, 179 US 343, 348 [1900] [“Cigarettes do not seem until recently to have attracted the attention of the public as more injurious than other forms of tobacco; nor are we now prepared to take judicial notice of any special injury resulting from their use or to indorse the opinion of the supreme court of Tennessee that They are inherently bad and bad only.’ At the same time we should be shutting our eyes to what is constantly passing before them were we to affect an ignorance of the fact that a belief in their deleterious effects, particularly upon young people, has become very general, and that communications are constantly finding their way into the public press denouncing their use as fraught with great danger to the youth of both sexes”].)
The very purpose of Statutes of Limitations has long been to insure that claims are fresh when pursued. (See, Bell v Morrison, 26 US 351, 360 [1828] [Statute of Limitations guards against “stale demands”].) This basic concept has not changed over the years. (See, Crown, Cork & Seal Co. v Parker, 462 US 345, 352 [1983] [“Limitations periods are intended to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights”].) And as correctly stated by Defendants, the alleged dangers of tobacco use have been repeatedly aired to the public over the course of the last century. (See, Small, supra, 252 AD2d, at 9 [“Plaintiffs’ claim of ignorance is implausible in light of years of pre-1994 press coverage of research on nicotine addiction, as well as the well-known difficulty of quitting smoking. Over the past two decades, the major New York newspapers have published literally hundreds of articles about nicotine addiction and reported numerous public statements by the Government and the public health industry to the effect that cigarettes contain a highly addictive drug”]; id. [“As far back as 1969, the press publicized Congress’s suspicions that cigarette manufacturers were *655 adjusting nicotine levels to ensure that customers would be unable to quit”]; see also, Beatie v City of New York, 123 F3d 707, 709 [2d Cir 1997] [“Tobacco use has long been identified as a cause of death and disease in smokers”]; Allgood v R.J. Reynolds Tobacco Co., 80 F3d 168, 172 [5th Cir], cert denied 519 US 930 [1996] [“the dangers of cigarette smoking have long been known to the community”], citing Roysdon v R.J. Reynolds Tobacco Co., 849 F2d 230, 236 [6th Cir 1988]; Paugh v R.J. Reynolds Tobacco Co., 834 F Supp 228, 230-231 [ND Ohio 1993].)
Moreover, other lawsuits since the 1950’s put the Funds on notice of the claims they now assert. (See, Cooper v R.J. Reynolds Tobacco Co., 234 F2d 170, 174 [1st Cir 1956] [“plaintiff has clearly, correctly, and with reasonable conciseness set forth a cause of action in deceit”]; Fine v Philip Morris, Inc., 239 F Supp 361, 362 [SD NY 1964] [plaintiff sued tobacco companies on various causes of action, including negligence and misrepresentation]; see also, Haines v Liggett Group, 140 FRD 681, 683 [D NJ 1992], vacated 975 F2d 81 [3d Cir 1992] [plaintiff alleged fraud by tobacco companies].)
Furthermore, the federal government has publicized health risks and costs associated with smoking since the 1960’s. The Surgeon General released a detailed report, which received extensive publicity, of the dangers of tobacco in January 1964. As outlined in Defendants’ Statute of Limitations memorandum of law, such publicity was accompanied and followed by a barrage of news reports detailing the hazards of smoking. Soon thereafter, the House Committee on Interstate and Foreign Commerce initiated a series of hearings regarding smoking-related health problems, which resulted in enactment of the Federal Cigarette Labeling and Advertising Act. (See, 15 USC § 1331 et seq.) This Act gave further notice to the general public of the dangers of tobacco, as it required manufacturers to place specific health-hazard warnings from the Surgeon General on cigarette packaging, advertising, and billboards. (15 USC § 1333.)
Against this backdrop, the Funds maintain that prior lawsuits do not trigger the Statute of Limitations, as the Funds did not commence its lawsuits until they had a responsible basis for believing Defendants were legally liable. The Funds further contend that under the doctrine of continuing wrong, the Statute of Limitations has not run. These claims, however, are not persuasive in light of the fact that the trustees of the Funds are bound by a fiduciary duty under ERISA. (See, Miller *656 v United Welfare Fund, 72 F3d 1066, 1073 [2d Cir 1995] [ERISA plan “trustees have an affirmative duty to seek expert advice when required”], citing Donovan v Bierwirth, 680 F2d 263, 272-273 [2d Cir], cert denied 459 US 1069 [1982].) In fact, the duties of a trustee are “the highest known to the law.” (Donovan, supra, 680 F2d, at 272, n 8.) It would therefore be contrary to its implicit duties for the Funds to delay litigation rather than affirmatively pursue it.
Nor can the Funds claim the Statute of Limitations did not begin to run under the doctrine of continuing wrong. As the Appellate Division has stated, “[i]t is a settled principle that once a compensable injury has occurred, the time within which an action may be commenced may not be extended merely by the aggravation, or exacerbation, of that injury by continued contact with the same offending product.” (Coughlin v International Bus. Machs. Corp., 225 AD2d 256, 260 [3d Dept 1996]; see also, New York Seven-Up Bottling Co. v Dow Chem. Co., 96 AD2d 1051, 1052 [2d Dept 1983], affd 61 NY2d 828 [1984] [“The cause of action accrued when the product first injured plaintiff, and the accrual date does not change as a result of continuing consequential damages”], citing Schmidt v Merchants Desp. Transp. Co., 270 NY 287, 300-301 [1936].)[6]
The Court recognizes the possible perception that dismissal based upon Statute of Limitations is arbitrary and technical. But as the United States Supreme Court has stated, “[although any statute of limitations is necessarily arbitrary, the length of the period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones.” (Johnson v Railway Express Agency, 421 US 454, 463-464 [1975]; see also, Board of Regents v Tomanio, 446 US 478, 487 [1980] [“Statutes of limitations are not simply technicalities. On the contrary, they have long been respected as fundamental to a well-ordered judicial system”].) The Funds’ claim that Defendants’ deceptive practices were only recently revealed is directly contradicted by case law. (See, Small, supra, 252 AD2d, at 5 [“The extent of the defendants’ allegedly deceptive prac *657 tices was first revealed, to the public in the spring of 1994 during the Congressional investigation into the tobacco industry”].) Accordingly, the action is dismissed on Statute of Limitations grounds as well.[7]
This opinion should not be interpreted as a statement that the allegations made by the Funds regarding the dangers of smoking are meritless. The perils of tobacco are now well documented and accepted as true by the general public. Indeed, the articles cited by Defendants in their memorandum of law seeking dismissal on Statute of Limitations grounds outlines abundant and recurrent studies linking tobacco to diseases and a massive scheme undertaken by the tobacco companies to conceal such information. Courts have also recognized the ill effects tobacco causes. (See, International Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund, supra, 196 F3d, at 824 [“We do not doubt that cigarette smoking causes heart disease, lung cancer, other medical problems, and early death— all of which are costly to smokers, employers, and society as a whole”].) What this Court concludes, however, is that the alleged damage to these named plaintiffs is too remote and indirect to maintain the instant suits. (See, Steamfitters Local Union No. 420 Welfare Fund, supra, 171 F3d, at 921 [“By subsuming the proximate cause requirement under the concept of standing, the Supreme Court has acknowledged that a private plaintiff might validly plead (and even prove) that a defendant has committed an antitrust violation, but still lack standing to enjoin or remedy this violation if his own injury is too remotely connected to it”].) Furthermore, due to the fact that the alleged fraudulent conduct was known to the general public years ago, and in light of the fact that the Funds have a fiduciary duty to protect its assets, the claims are untimely pursuant to the Statute of Limitations. As sympathetic as the Court is to the Funds’ claims, the law demands dismissal.
Accordingly, it is ordered that the motion to dismiss is granted and the complaint is dismissed.

. Defendants Liggett & Myers, Inc. and B.A.T. Industries, PLC do not join in the motion to dismiss pursuant to CPLR 3211 (a) (5).

. These 10 actions were filed between July and December 1997. Defendants make identical arguments in moving to dismiss each of the 10 actions.

. Defendants Philip Morris, Inc., R.J. Reynolds Tobacco Co., RJR Nabisco Holding Corp., RJR Nabisco, Inc., American Tobacco Company, Brown & Williamson Tobacco Corp., B.A.T. Industries, PLC, British American Tobacco Company, Ltd., Liggett & Myers Inc., Lorillard Tobacco Co., Inc., and United States Tobacco Co. are in the business of manufacturing, advertising, and selling tobacco products. The Council for Tobacco Research-U.S.A., Inc., The Tobacco Institute, Inc., and Smokeless Tobacco Council, Inc. are public relations and lobbying entities in the tobacco industry. Hill & Knowlton, Inc. is a public relations firm retained by the various tobacco companies.

. The Supreme Court has used similar reasoning in regard to antitrust violations as alleged in the instant case. (See, Blue Shield v McCready, 457 US 465, 477 [1982] [“It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property”].)

. New York’s Court of Appeals has stated its disapproval with such an outcome in the context of employment. (See, Ferguson v Green Is. Contr. *647 Corp., 36 NY2d 742, 743 [1975] [“An employer has no right to recover damages sustained when one of its employees is injured in consequence of the negligence of a third party”].)

. The relevant Statute of Limitations for the various causes of action range from one year for the intentional torts (see, CPLR 215 [3]) to six years for the indemnity and fraud claims. (See, CPLR 213 [2], [8].) Because the various claims accrued more than six years before the actions were commenced, there is no need to evaluate the Statute of Limitations for each particular claim.

. In light of the fact that the Court has found dismissal is warranted upon failure to state a cause of action and Statute of Limitations grounds, the motions to dismiss based upon failure to join necessary parties and lack of personal jurisdiction as to B.A.T. need not be addressed.