State of NEW YORK and Erin M. Crotty, Commissioner of the New York State Department of Environmental Conservation, Plaintiffs,

v.

NIAGARA MOHAWK POWER CORPORATION, NRG Energy, Inc., NRG Northeast Generation,[1] NRG Dunkirk Operations, Inc., Dunkirk Power, LLC, NRG Huntley Operations, Inc., Huntley Power, LLC, NRG Northeast Generating, LLC, NRG Eastern, LLC, and NRG Operating Services, Inc., Defendants.

No. 02–CV–24S.

United States District Court,
W.D. New York.

April 28, 2003.

---

1. NRG Northeast Generation does not exist as a corporate entity. Accordingly, the State consents to the dismissal of NRG Northeast Generation from this action. *See* Reply Declaration of Michael J. Myers, ¶ 5.

Michael Joseph Myers, J. Jared Snyder, Office of the Attorney General Environmental Protection Bureau, Albany, NY, for Plaintiffs.

Thomas R. Lotterman, Duke K. McCall, III, Swidler Berlin Shereff Friedman, LLP, Washington, DC, Joseph M. Finnerty, Stenger & Finnerty, Buffalo, NY, Timothy J. Lambrecht, Devorsetz, Stinziano, Gilberti, Heintz & Smith, P.C., Syracuse, NY, Kevin J. Brown, William J. Gilberti, Jr., Devorsetz, Stinziano, Gilberti, Heintz & Smith, P.C., Syracuse, NY, William M. Bumpers, David Super, Baker Botts LLP, Washington, DC, for Defendants.

### DECISION AND ORDER

SKRETNY, District Judge.

## I. INTRODUCTION

Plaintiffs State of New York and Erin M. Crotty ("the State") bring this action as *parens patriae* pursuant to the citizen suit provisions of the Clean Air Act, 42 U.S.C. §§ 7604(a) and 7477, seeking redress for alleged violations of the federal Clean Air Act and related state environmental conservation laws by Defendants Niagara Mohawk Power Corp. ("Niagara Mohawk") and nine other defendants[2] (the "NRG Defendants").

Presently before this Court are two separate Motions to Dismiss the State's Amended Complaint[3]: one filed by Niagara Mohawk, the other filed jointly by the NRG Defendants.[4] This Court heard oral argument on both motions on July 16, 2002, and took the matters under advisement at that time. For the reasons stated below, this Court will grant in part and deny in part Niagara Mohawk's Motion to Dismiss, and grant the NRG Defendants' Motion to Dismiss in its entirety.

## II. BACKGROUND

### A. Regulatory Background: The Clean Air Act

The Clean Air Act, 42 U.S.C. § 7401 *et seq.*, was originally enacted in 1955. Congress has since enacted significant amendments to the Act, most notably in 1970, 1977 and 1990. The federal regulations implementing the Clean Air Act are codified at 40 C.F.R. § 50 *et seq.* Though somewhat of a work in progress, the objective of the Clean Air Act has remained

---

**2.** The other nine defendants are NRG Energy, Inc., NRG Northeast Generation, NRG Dunkirk Operations, Inc., Dunkirk Power, LLC, NRG Huntley Operations, Inc., Huntley Power, LLC, NRG Northeast Generating, LLC, NRG Eastern, LLC, and NRG Operation Services, Inc.

**3.** To correct several technical errors, the State filed an Amended Complaint on July 17, 2002, one day after oral argument was held. The filing of the Amended Complaint does not substantively effect the Motions to Dismiss presently before this Court.

**4.** In support of its Motion to Dismiss, Niagara Mohawk filed a Notice of Motion to Dismiss, with exhibits, a Memorandum of Law, a Reply Memorandum of Law, a Supplemental Brief, and two Memoranda regarding supplemental authority. In support of their Motion to Dismiss, the NRG Defendants filed Notice of Motion to Dismiss, a Memorandum of Law, with exhibits, the Affidavit of Kevin J. Brown, Esq., a Reply Memorandum of Law, a Supplemental Brief, a Praecipe, and two Memoranda regarding supplemental authority. In joint opposition to both motions, the State filed a Memorandum in Opposition, the Affidavit of Michael J. Myers, Esq. in Opposition, a Supplemental Brief, and two Memoranda regarding supplemental authority.

constant: for the federal government to work with the states to promote the public health and welfare by protecting and enhancing the quality of the nation's air, and to encourage and assist in the development and operation of regional air pollution prevention and control programs. 42 U.S.C. §§ 7401(b)(1) and (4).

While the Clean Air Act is a piece of federal legislation, the Act itself recognizes that air pollution prevention and control measures must be directed at the source of the pollution. 42 U.S.C. § 7401(a)(3). Primary responsibility for implementation of the Act therefore falls on state and local governments. *Id.* Accordingly, the interplay and cooperation of the federal and state governments is crucial to meet the objectives of the Clean Air Act. *See, e.g.,* 42 U.S.C. § 7402.

Under the Act, the United States Environmental Protection Agency is charged with establishing primary and secondary national ambient air quality standards for particular air pollutants.[5] *See* 42 U.S.C. §§ 7408, 7409. Each state must submit a "state implementation plan" ("SIP") providing for the implementation, maintenance, and enforcement of these primary and secondary national ambient air quality standards. 42 U.S.C. § 7410. New York has complied with this requirement. *See* 6 N.Y.C.R.R. §§ 200–317.

The Act also provides for "new source review," which is intended to control emissions from new and modified stationary sources.[6] For "nonattainment areas,"[7] the plan requirements codified at 42 U.S.C. §§ 7501–7515 govern; for "attainment areas,"[8] the provisions for the prevention of significant deterioration of air quality ("PSD") codified at 42 U.S.C. §§ 7470–7492 control.

At issue here are the PSD provisions. These provisions were enacted in 1977 to ensure that attainment areas continue to maintain the national air quality standards. *United States v. Illinois Power Co.,* 245 F.Supp.2d 951, 953 (S.D.Ill.2003); *LaFleur v. Whitman,* 300 F.3d 256, 260–61 (2d Cir. 2002). The express purpose of these provisions, *inter alia,* is to protect public health and welfare from any adverse effects from air pollution and to ensure economic growth while preserving clean air resources. 42 U.S.C. §§ 7470(1) and (3).

Under 42 U.S.C. § 7475(a), no major emitting facilities[9] on which construction[10]

---

**5.** Primary ambient air quality standards are the minimal air quality standards required to protect the public health. *See* 42 U.S.C. § 7409(b)(1). Secondary ambient air quality standards are the minimal air quality standards required to protect the public welfare from any known or anticipated adverse effects associated with the presence of air pollution. *See* 42 U.S.C. § 7409(b)(2).

**6.** A "stationary source" is "any building, structure, facility, or installation which emits or may emit any air pollutant." 42 U.S.C. § 7411(a)(3).

**7.** The phrase "nonattainment area" refers to any area that does not meet the national primary or secondary ambient air quality standard for a given pollutant. *See* 42 U.S.C. § 7407(d)(1)(i).

**8.** The phrase "attainment area" refers to any area that meets the national primary or secondary ambient air quality standard for a given pollutant. *See* 42 U.S.C. § 7407(d)(1)(ii).

**9.** Forty-two U.S.C. § 7478(1) lists the stationary sources of air pollutants and the emission requirements that qualify as a "major emitting facility."

**10.** As used in this section, the term "construction" includes the modification of any source or facility. 42 U.S.C. § 7479(2)(C). The term "modification" is defined as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. § 7411.

is commenced after August 7, 1977, may be constructed unless the preconstruction requirements of 42 U.S.C. § 7475 have been satisfied. Those requirements include, among others, that a preconstruction permit setting forth emissions limitations for the proposed facility be obtained, that the proposed facility be subject to the best available control technology [11] ("BACT") for each pollutant subject to regulation, that there be an analysis of any air quality impacts projected due to the growth of the proposed facility, and that the person who owns or operates the proposed facility agree to conduct such monitoring as may be necessary to determine the effect of any emissions. *See* 42 U.S.C. §§ 7475(a)(1), (4), (6) and (7).

## B. The State's Amended Complaint

At this stage, this Court assumes the truth of the factual assertions contained in the State's Amended Complaint. *See Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976); *see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 128 F.3d 59, 63 (2d Cir.1997).

### 1. Niagara Mohawk

The State alleges that Niagara Mohawk constructed or modified two major emitting facilities—the Dunkirk and Huntley power plants (the "Facilities")—without securing the proper preconstruction permits and implementing the proper pollu-

tion emissions controls required by federal and state law. (Amended Complaint, ¶¶ 1, 2.) The Dunkirk facility is located in Dunkirk, New York; the Huntley facility is located in Tonawanda, New York. (Amended Complaint, ¶¶ 2, 18, 19.)

Beginning in the early 1980s, Niagara Mohawk instituted a program to extend the operational lives of its aging power-generating boiler units at the Facilities. (Amended Complaint, ¶ 63.) Each of the ten boiler units in question were nearing their anticipated retirement dates.[12] (Amended Complaint, ¶¶ 48, 49, 56, 57, 58.) Extending the operational lives of these units would allow Niagara Mohawk to recoup lost generating capacity and decrease the occurrences of forced outages. (Amended Complaint, ¶¶ 63, 70.)

In 1985, Niagara Mohawk developed a two-phase approach for examining the boiler units at the Facilities. (Amended Complaint, ¶ 67.) The first phase consisted of inspecting high energy components such as turbine generators, steam and mud drums, economizer inlet headers and piping subject to creeping. (Amended Complaint, ¶ 67.) The second phase involved inspecting boilers, major equipment and piping susceptible to corrosion, electrical, instrumentation and control items. (Amended Complaint, ¶ 67.)

In 1987, Niagara Mohawk organized a life extension project team to coordinate life extension modifications at the Facili-

---

**11.** "Best available control technology" is defined by statute as:

[A]n emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility through application of production process-

es and available methods, systems, and techniques, including fuel cleaning, clean fuels, or treatment of innovative fuel combustion techniques for control of each such pollutant.

42 U.S.C. § 7479(3).

**12.** The ten boiler units include units 1–4 at the Dunkirk facility and units 63–68 at the Huntley facility. (Amended Complaint, ¶¶ 47, 54.)

ties. (Amended Complaint, ¶ 69.) Niagara Mohawk determined that extending the operational lives of the Facilities would cost approximately nine times less than building three new coal-fired units. (Amended Complaint, ¶ 69.) It therefore continued modifying the Facilities as part of its life extension program. (Amended Complaint, ¶ 70.)

Between 1982 and 1999, each of the boiler units at the Facilities underwent modification upgrades. (Amended Complaint, ¶¶ 71–75 (Unit 1), 101–108 (Unit 2), 134–142 (Unit 3), 168–173 (Unit 4), 64, 199–204 (Unit 63), 231–236 (Unit 64), 262–266 (Unit 65), 292–295 (Unit 66), 321–326 (Unit 67), 352–361 (Unit 68).) Each of these modifications constituted a "major modification" or "construction of a major emitting facility" requiring the issuance of a preconstruction permit prior to commencement of construction. (Amended Complaint, ¶¶ 77,110, 144, 175, 206, 238, 268, 297, 328, 363.) Niagara Mohawk never applied for or obtained the appropriate permits for any of these modifications. (Amended Complaint, ¶¶ 78, 111, 145, 176, 207, 239, 269, 298, 329, 364.) Nor did Niagara Mohawk implement BACT for the emissions of nitrogen oxides and sulfur dioxide from the Facilities. (Amended Complaint, ¶¶ 87, 119, 154, 185, 216, 248, 278, 307, 338, 373.)

Niagara Mohawk owned and operated the Facilities until June 11, 1999, at which time it transferred ownership to the NRG Defendants. (Amended Complaint, ¶¶ 2, 13.)

**2. NRG Defendants**

Defendant NRG Energy, Inc., currently owns and operates the Dunkirk facility through its subsidiaries Defendants NRG Eastern, LLC, NRG Northeast Generating, LLC, NRG Operating Services, Inc., Dunkirk Power, LLC and NRG Dunkirk Operations, Inc. (Amended Complaint, ¶ 2.) Defendant NRG Energy, Inc. also currently owns and operates the Huntley facility through its subsidiaries NRG Eastern, LLC, NRG Northeast Generating, LLC, NRG Operating Services, Inc., Huntley Power, LLC and NRG Huntley Operations, Inc. (Amended Complaint, ¶ 2.)

Although the State has generally lumped Niagara Mohawk and the NRG Defendants together in its Amended Complaint, it is clear from oral argument that the State does not assert that the NRG Defendants actually made any modifications to the Facilities. Rather, the State alleges that the NRG Defendants are liable for continuing to operate the Facilities without preconstruction permits and without implementation of BACT.

**III. DISCUSSION**

A court may dismiss an action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which will entitle him to relief.' " *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). All well-pleaded allegations are accepted as true and construed in the non-movant's favor. *Christopher v. Harbury*, 536 U.S. 403, 406, 122 S.Ct. 2179, 2182, 153 L.Ed.2d 413 (2002). If it appears from the face of the Complaint that a cause of action has not been brought within the applicable statute of limitations period, the defense of limitations "may be raised in a pre-answer motion pursuant to Fed.R.Civ.P. 12(b)(6)." *Santos v. Dist. Council of New York City*, 619 F.2d 963, 967 n. 4 (2d Cir.1980); *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir.1989).

## A. Niagara Mohawk's Motion to Dismiss

At the outset, it is important to note that the Clean Air Act contains separate programs and provisions for construction permits and operation permits. *Compare* 42 U.S.C. § 7475, *with* 42 U.S.C. § 7661 *et seq.; see Illinois Power*, at 955–56 (recognizing the importance of the Act's separate requirements for preconstruction permits and operating permits). In the context of the present motions, the distinction is critical. *Cf. United States v. Southern Indiana Gas and Elec. Co.*, No. IP 99–1692–C–M/F, 2002 WL 1760752, at *4 (S.D.Ind. July 26, 2002) (noting that distinction between the two types of permits is "crucial"). Here, the State has elected to civilly prosecute this case under the Clean Air Act's construction permit requirements, rather than under the Act's operation permit requirements. Among other allegations, the State alleges that Niagara Mohawk completed major modifications at the Facilities without securing the proper preconstruction permits. While the State contends that "[preconstruction] permits are primarily operating permits" (*see* State's Memorandum in Opposition, at 7), the language and structure of the Act reveals otherwise.

The pertinent provisions of the Clean Air Act's preconstruction requirements provide:

(a) Major emitting facilities on which construction is commenced

No major emitting facility on which construction is commenced after August 7, 1977, may be constructed in any area to which this part applies unless -

(1) a permit has been issued for such proposed facility in accordance with this part setting forth emission limitations for such facility which conform to the requirements of this part;

(2) the proposed permit has been subject to a review in accordance with this section, the required analysis has been conducted in accordance with regulations promulgated by the Administrator, and a public hearing has been held with opportunity for interested persons including representatives of the Administrator to appear and submit written or oral presentations on the air quality impact of such source, alternatives thereto, control technology requirements, and other appropriate considerations;

(3) the owner or operator of such facility demonstrates, as required pursuant to section 7410(j) of this title, that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of any (A) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which this part applies more than one time per year, (B) national ambient air quality standard in any air quality control region, or (C) any other applicable emission standard or standard of performance under this chapter;

(4) the proposed facility is subject to the best available control technology for each pollutant subject to regulation under this chapter emitted from, or which results from, such facility

(5) the provisions of subsection (d) of this section with respect to protection of class I areas have been complied with for such facility;

(6) there has been an analysis of any air quality impacts projected for the area as a result of growth associated with such facility;

(7) the person who owns or operates, or proposes to own or operate, a major emitting facility for which a permit is required under this part agrees to conduct such monitoring as may be necessary to determine the effect which emis-

sions from any such facility may have, or is having, on air quality in any area which may be affected by emissions from such source; and

(8) in the case of a source which proposes to construct in a class III area, emissions from which would cause or contribute to exceeding the maximum allowable increments applicable in a class II area and where no standard under section 7411 of this title has been promulgated subsequent to August 7, 1977, for such source category, the Administrator has approved the determination of best available technology as set forth in the permit.

42 U.S.C. § 7475(a).

By its plain terms, this section governs the conditions under which a major emitting facility "may be constructed." 42 U.S.C. § 7475(a). Thus, these requirements must be fulfilled *prior to* construction. The companion federal regulation, 40 C.F.R. 52.21, also supports the conclusion that this section applies at the preconstruction or construction phase:

(2) Applicability procedures.

(i) The requirements of this section *apply to the construction of any new major stationary source* ... or any project at an existing major stationary source in an area designated as attainment or unclassifiable under section 107(d)(1)(A)(ii) and (iii) of the Act.

(ii) The requirements of paragraphs (j) through (r) of this section *apply to the construction of any new major stationary source or the major modification of any existing major stationary source,* except as this section otherwise provides.

(iii) No new major stationary source or major modification to which the requirements of paragraphs (j) through (r)(5) of this section apply *shall begin actual construction without a permit that states that the major stationary source or ma-*

*jor modification will meet those requirements.* The Administrator has authority to issue any such permit.

40 C.F.R. §§ 52.21(a)(2)(i)-(iii) (emphasis added).

In stark contrast, the operation permit provisions provide, *inter alia*, that:

[I]t shall be unlawful for any person to violate any requirement of a permit issued under this subchapter, *or to operate ... a major source ... except in compliance with a permit issued by a permitting authority under this subchapter.*

42 U.S.C. § 7661a (emphasis added). The goal of the operating permit program is to collect all of the "applicable requirements" under the Clean Air Act that govern the operation of a "major source" into a single operating permit, and to provide for monitoring and other methods of determining compliance with those requirements. 42 U.S.C. §§ 7661c(a), (b). The operating permits must include limitations on emissions and other conditions necessary to ensure compliance with the provisions of the Clean Air Act, including the PSD program. *LaFleur*, 300 F.3d at 262 (citing 42 U.S.C. §§ 7661a(a), 7661c(a); 40 C.F.R. §§ 70.1(b), 70.2).

Even in the operating permit provisions, it is parenthetically recognized that preconstruction permits under § 7475 are distinct, and must be obtained prior to construction. *See* 42 U.S.C. § 7661a (noting that "(Nothing in this subsection shall be construed to alter the applicable requirements of this chapter that a permit be obtained before construction or modification.")).

**1. Preconstruction Permit Violations: 42 U.S.C. § 7475(a)(1)**

**a. Citizen Suit Provisions of the Clean Air Act**

Niagara Mohawk first moves for dismissal of the State's claims for violations of

the preconstruction permit requirements on the ground that the Act's citizen suit provisions do not authorize such claims. The State brings this action pursuant to the citizen suit provisions of the Clean Air Act, 42 U.S.C. §§ 7604(a) and 7477. (Amended Complaint, ¶¶ 1, 9).

The applicable provisions of 42 U.S.C. § 7604(a) provide as follows:

> Except as provided in subsection (b) of this section, any person[13] may commence a civil action on his own behalf -
>
> (1) against any person ... who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation,
>
> . . . . .
>
> (3) against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I of this chapter (relating to significant deterioration of air quality) or part D of subchapter I of this chapter (relating to nonattainment) or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit.

42 U.S.C. §§ 7604(a)(1) and (3).

■ Niagara Mohawk asserts that the State's causes of action alleging that it failed to obtain preconstruction permits in violation of 42 U.S.C. § 7475(a)(1) must be dismissed because the citizen suit provisions of the Clean Air Act do not authorize

suits for wholly past violations of the preconstruction permit requirement. This Court disagrees, and finds that the State's action fits squarely within the citizen suit provisions of 42 U.S.C. § 7604(a)(3).

The starting point for this Court's analysis is the plain language of the statute itself. *See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409, 113 S.Ct. 2151, 2157, 124 L.Ed.2d 368 (1993); *United States v. Nelson*, 277 F.3d 164, 193 (2d Cir.2002). In reviewing the language of 42 U.S.C. § 7604(a)(3), this Court must "determine whether the language at issue has a plain and unambiguous meaning." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997). If it does, this Court's analysis ends, as no further inquiry is required. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S.Ct. 755, 760, 142 L.Ed.2d 881 (1999).

This Court finds the language of 42 U.S.C. § 7604(a)(3) unambiguous. By its plain terms, § 7604(a)(3) authorizes citizen suits, like this one, against any person who constructs a facility without a preconstruction permit. Section 7604(a)(3) specifically states that a suit is authorized "against *any person who ... constructs any new or modified major emitting facility without a permit*." As the court stated in *Ogden Projects, Inc. v. New Morgan Landfill Co., Inc.*: "This provision [42 U.S.C. § 7604(a)(3) ] thus expressly authorizes citizen suits against persons who propose to construct *or who do construct* major facilities without the proper ... permit." 911 F.Supp. 863, 867 (E.D.Pa.1996) (emphasis added). Since the State alleges that Niagara Mohawk constructed the Facilities without first obtaining preconstruc-

---

**13.** As used in this section, the term "person" includes "an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agent, or employee thereof." 42 U.S.C. § 7602(e). There is no disagreement that each of the parties meets the definition of "person" under this section.

tion permits, this action falls squarely within 42 U.S.C. § 7604(a)(3).

Despite this clear language, Niagara Mohawk argues that the Supreme Court's decision in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), precludes citizen suits for "wholly past" violations, such as failing to obtain preconstruction permits. In *Gwaltney*, the Court held that the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365(a)(1), did not confer federal jurisdiction over citizen suits for wholly past violations.

*Gwaltney*, however, is distinguishable. First, the Court in *Gwaltney* was reviewing 33 U.S.C. § 1365(a)(1), which is a corollary to the Clean Air Act's citizen suit provision at 42 U.S.C. § 7604(a)(1), not a corollary to 42 U.S.C. § 7604(a)(3).[14] Second, the Court's focus in examining the statutory language and relevant legislative history fell on the "alleged to be in violation" language of 33 U.S.C. § 1365(a). *See Atlantic States Legal Found., Inc. v. Buffalo Envelope Co.*, No. CIV–90–1110S, 1991 WL 183772, at *6 (W.D.N.Y. Sept. 10, 1991) (Skretny, J.); *Atlantic States Legal Found., Inc. v. Whiting Roll–Up Door*

*Manuf. Corp.*, 772 F.Supp. 745, 752 (W.D.N.Y.1991) (Skretny, J.). That operative language is not present in 42 U.S.C. § 7604(a)(3). Unlike in *Gwaltney*, where it was unclear whether the "alleged to be in violation" language referred to past or present conduct, here it is clear that use of the term "constructs" in 42 U.S.C. § 7604(a)(3) refers to past violations. *Cf. Atlantic States*, 1991 WL 183772, at *7 (in which this Court distinguished *Gwaltney* in the context of a citizen's enforcement action under the Emergency Planning and Community Right–to–Know Act on basis that the same interpretive language was not at issue); *see Ogden Projects*, 911 F.Supp. at 867 (finding that § 7604(a)(3) expressly authorizes citizen suits against persons who construct major facilities without the proper permit). *Gwaltney* is therefore not instructive on this point, and does not bar the State's claims.

■ Thus, in this Court's view, 42 U.S.C. § 7604(a)(3) plainly and unambiguously authorizes the State's claims that Niagara Mohawk failed to obtain preconstruction permits in violation of 42 U.S.C. § 7475(a)(1). Further exercise in statutory construction is therefore unnecessary.[15]

---

14. Thirty-three U.S.C. § 1365(a)(1) provides as follows:

> Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf -
> (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation.

Forty-two U.S.C. § 7604(a)(1) provides as follows:

> Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf -
> (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A)an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation.

15. Where, as here, the language of a statute is unambiguous, only the most extraordinary showing of contrary intentions would justify altering its plain meaning. *See Garcia v.*

*Marvel. Characters, Inc. v. Simon,* 310 F.3d 280, 290 (2d Cir.2002) ("when the language of a statute is unambiguous, judicial inquiry is complete") (internal citations omitted). Niagara Mohawk's Motion to Dismiss on this ground is denied.[16]

### b. Statute of Limitations

The State alleges that Niagara Mohawk modified units at the Facilities fifty-five times between 1982 and 1999 without obtaining the proper preconstruction permits. (Amended Complaint, ¶¶ 71–74, 101–107, 134–141, 168–172, 199–203, 231–235, 262–265, 292–294, 321–325, 352–360.) Niagara Mohawk argues that all of the alleged violations occurring prior to November 28, 1996, are barred by the 5–year federal statute of limitations in 28 U.S.C. § 2462.[17]

■ The State, in opposition to Niagara Mohawk's argument, contends that the statute of limitations is effectively tolled because Niagara Mohawk's violations of the permitting requirements constitute an ongoing and continuing violation. *See, e.g., Havens Realty Corp. v. Coleman,* 455 U.S. 363, 380–81, 102 S.Ct. 1114, 1125, 71 L.Ed.2d 214 (1982) (recognizing that statute of limitations may be tolled where violations are ongoing). Application of this

doctrine, however, requires that the continuing violation be occasioned by continual unlawful acts, not continual ill effects from a single violation. *See Seifert v. Santiago,* No. 95–CV–71H, 1997 WL 250059, *3 (W.D.N.Y. Apr. 2, 1997) (quoting *Ward v. Caulk,* 650 F.2d 1144, 1147 (9th Cir. 1981)); *see also Halpern v. Bristol Bd. of Educ.,* 52 F.Supp.2d 324, 332 (D.Conn. 1999).

Because the Clean Air Act contains no specific statute of limitations provision, the 5–year statute of limitations set forth in 28 U.S.C. § 2462 applies.[18] *See Illinois Power,* at 954–55; *Southern Indiana Gas,* 2002 WL 1760752, at *3; *United States v. Murphy Oil USA, Inc.,* 143 F.Supp.2d 1054, 1080 (W.D.Wis.2001); *United States v. Westvaco Corp.,* 144 F.Supp.2d 439, 442 (D.Md.2001); *United States v. Brotech Corp.,* No. Civ.A. 00–2428, 2000 WL 1368023, *3 (E.D.Pa. Sept. 19, 2000). Under § 2462, the limitations period begins to run on the date that the violation first occurs. *Illinois Power,* at 955; *Southern Indiana Gas,* 2002 WL 1760752, at *3.

In support of its continuing violation theory, the State argues that the Act's preconstruction requirements imposed a continuing obligation on Niagara Mohawk to obtain preconstruction permits for the

---

*United States,* 469 U.S. 70, 75, 105 S.Ct. 479, 482–83, 83 L.Ed.2d 472 (1984). Niagara Mohawk has not made such a showing.

16. Because this Court finds that 42 U.S.C. § 7604(a)(3) authorizes the State's claims for failure to obtain a preconstruction permit, this Court declines to address the applicability of the additional enforcement provisions at 42 U.S.C. § 7477, an issue that the State has not fully briefed. (*See* State's Memorandum of Law in Opposition, p. 29 n. 28.)

17. The State filed its initial Complaint on January 10, 2002. However, upon representation of counsel, this Court understands that the State and Niagara Mohawk agreed to toll

the statute of limitations for a period of forty-three days between April 18, 2001, and May 31, 2001. Accordingly, November 28, 1996, marks the beginning of the limitations period as to Niagara Mohawk.

18. Twenty-eight U.S.C. § 2462 provides:

Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued, if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

Facilities. Under the State's theory, every day that a facility operates without a preconstruction permit, the limitations period begins anew. The State's position, taken to its logical end, suggests a *de facto* elimination of any statute of limitation, for the limitation period would never begin to accrue as long as the facility remained in operation. In this Court's view, the plain language of the Act and its implementing regulations defeat the State's position.

■ Under the Act, violations of the preconstruction permitting requirements occur at the time of construction, not on a continuing basis. The provisions of 42 U.S.C. § 7475 focus on requirements that must be fulfilled *prior to* construction or modification of a facility. *See, e.g.,* 42 U.S.C. § 7475(a) ("no major emitting facility ... *may be constructed* ..."); 42 U.S.C. § 7475(a)(1) ("a permit has been issued for such *proposed* facility ..."); 42 U.S.C. § 7475(a)(3) (the owner or operator of the *proposed* facility must demonstrate that emissions resulting from construction or operation of the facility "*will* not cause, or contribute to, air pollution ..."); 42 U.S.C. § 7475(a)(4) ("the *proposed facility* is subject to [BACT] ..."). Moreover, the "applicability" provisions of the Environmental Protection Agency's own implementing regulations at 40 C.F.R. § 52.21 demonstrate that the preconstruction requirements apply only at the time of construction or modification. *See* 40 C.F.R. § 52.21(a)(2)(i)-(iii). Section 7475(a) therefore applies to the construction (including modification) of stationary sources, not to their operation.[19]

A given construction or modification project occurs only once. If a permit is not obtained for that particular project,

then the preconstruction permit requirement of the Clean Air Act has been violated. However, the requirement to secure a preconstruction permit applies *prior* to construction or modification. Once the construction or modification is complete, the window in which to apply for and obtain a preconstruction permit is gone. Thus, a violation of the Clean Air Act's preconstruction permit requirement is singular in nature, and does not constitute an ongoing violation. *Cf. Satterfield v. J.M. Huber Corp.,* 888 F.Supp. 1561, 1564 (N.D.Ga.1994) ("A defendant can only fail to obtain a permit once.").

Indeed, a majority of courts addressing the continuing violation theory have reached the same conclusion. *See, e.g., Illinois Power,* at 954–57 (barring preconstruction permit violation as untimely because violation was "discrete" and complete at the time of construction); *Southern Indiana Gas,* 2002 WL 1760752, at *5 (violations under 42 U.S.C. § 7475 and 40 C.F.R. § 52.21 accrue at the time of modification and do not continue past the completion of construction); *Murphy Oil,* 143 F.Supp.2d at 1083–84 ("the statute of limitations for a violation of the pre-construction permit requirements under 42 U.S.C. § 7475 begins to run at the time of construction and does not continue through the operational life of the modified source"); *Westvaco Corp.,* 144 F.Supp.2d at 443–44 ("a violation for failure to obtain a construction permit does not continue once the unpermitted construction is completed"); *Brotech,* 2000 WL 1368023, at *3–4 (dismissing claim for civil penalties based on failure to obtain construction permits as time barred; "[v]iolations of the various requirements

---

19. The enforcement provisions of the Act further support this interpretation. Forty-two U.S.C. § 7477, for example, requires the Administrator, and permits a State, to take the necessary measures *"to prevent the construction or modification"* of nonconforming major emitting facilities.

to obtain construction permits or plan approvals occur at the time of the construction, modification, or installation of the equipment or facility"); *United States v. Campbell Soup Co.*, No. CIV-S-95-1854 DFL, 1997 WL 258894, at *1-2 (E.D.Cal. Mar. 11, 1997) (altering a machine without a permit is not a violation that continues as long as the machine still exists or is operated).[20]

The State recognizes the weight of authority against its position, but nonetheless urges this Court to consider the underlying purpose of the Clean Air Act, to protect public health and the environment, in finding a continuing violation. This argument, however, rings particularly hollow in light of the fact that the State specifically chose to pursue its claims under the pre-construction, rather than the operating, permit provisions. As far as this Court is aware, this was a tactical decision by the State: nothing foreclosed it from pursuing operating permit violations.[21]

This Court concurs in the conclusion that *"operating* a facility after it was modified without first obtaining the necessary construction permit may constitute a continuing violation of the relevant *operating permit,* but it does not constitute a continuing violation of the relevant *construction permit."* *Southern Indiana Gas,* 2002 WL 1760752, at *5 (emphasis in original). Continuing violations are more appropriately enforced through the operating permit requirements. *See* 42 U.S.C. § 7661 *et seq.; Illinois Power,* 2003 WL 367214, at *5 (noting that "[p]reconstruc-

---

**20.** The State relies on the Fifth Circuit's decision in *United States v. Marine Shale Processors,* 81 F.3d 1329 (5th Cir.1996), where the court rejected a statute of limitations defense. However, as recognized by a number of courts, the value of *Marine Shale* is significantly diminished because it is unclear whether the defendants were alleged to have violated construction permits, operation permits, or both. *See Illinois Power,* at 956 n. 2 (discussing diminished value of *Marine Shale* ); *Murphy Oil,* 143 F.Supp.2d at 1083 (distinguishing *Marine Shale* ); *Brotech,* 2000 WL 1368023, *3 (similar). Moreover, this Court is cognizant of the contrary holdings cited by the State at pages 12–13 of their Memorandum in Opposition. *See, e.g., United States v. American Elec. Power Serv. Corp.,* 137 F.Supp.2d 1060, 1066–67 (S.D.Ohio 2001); *United States v. Ohio Edison Co.,* No. 2:99-CV-1811 (S.D.Ohio Jan. 17, 2003); *United States v. Duke Energy Corp.,* 171 F.Supp.2d 560, 564 (M.D.N.C.2001). However, this Court is persuaded by the opposite line of cases cited above, which more fully appreciate the salient distinctions between preconstruction and operating permits under the Clean Air Act.

**21.** At oral argument, this Court directly asked counsel for the State why it did not allege violations of the operating permit requirements. Counsel responded that in the State's view, proceeding with the preconstruction permit violations was "the most straightforward claim that [it] could bring ...." (July 16, 2003 Oral Argument Tr., at 17.) Moreover, counsel stated: "We could have alleged a violation of the operating permit. We could still do that ...." (July 16, 2003 Oral Argument Tr. at 17) The State presented no legal bar to its proceeding under the operating permit requirements.

This Court and counsel for the State also had this exchange:

The Court: Well, does the state have any other avenue of enforcement to go after a violator—I mean, somebody that fails to get a permit and then fails to use the best available control technology other than this?

Mr. Snyder: The Title V permitting process—Title V requires that all applicable requirements to be put in the Title V permit. The applicable requirements are defined to include the PSD and NSR requirements that apply to the operation of the plant, such as BACT. DEC could revise the Tittle V permits to require the implementation of BACT, and then we would presume that NRG would appeal that determination through the administrative process... But that process is another process that would be available to DEC.

(July 16, 2003 Tr. at 40.)

tion permits have a finite existence while operational permits can be ongoing violations").

Accordingly, the State's claims for civil penalties for violations of the preconstruction permit requirements at 42 U.S.C. § 7475(a) and 40 C.F.R. § 52.21 falling outside the federal statute of limitations period are time barred. These claims are therefore dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state claims upon which relief may be granted.[22]

### 2. BACT Violations

#### a. Citizen Suit Provisions of the Clean Air Act

Niagara Mohawk argues that the State's BACT claims are not authorized by the citizen suit provisions of the Clean Air Act, specifically 42 U.S.C. § 7604(a)(1). That provision authorizes suit "against any person ... who is alleged to have violated ... or to be in violation of (A) an emission standard or limitation under this chapter...." 42 U.S.C. § 7604(a)(1).

Niagara Mohawk argues that BACT is not "in effect" as required by 42 U.S.C. § 7604(f), which requires that an emission standard or limitation be "in effect" to meet the statutory definition of "emission standard or limitation under this chapter." Niagara Mohawk's argument centers around its position that BACT cannot be "in effect" under the statutory definition because the permitting authority has not determined what BACT is for the Facilities. It appears uncontroverted, however, that if BACT had been determined by the

permitting authority and the Facilities were not in compliance, suit would be authorized under 42 U.S.C. § 7604(a)(1).

■ A remedial statute should be liberally construed to effectuate its purpose, *Peyton v. Rowe*, 391 U.S. 54, 65, 88 S.Ct. 1549, 1555, 20 L.Ed.2d 426 (1968), and should not be interpreted in a manner that would frustrate its goals, *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1045 (2d Cir.1985). Implicit in the requirement that a facility be subject to BACT pursuant to 42 U.S.C. § 7475(a)(4) is an obligation on the part of the person proposing the construction or modification to obtain the appropriate BACT determination. Niagara Mohawk's argument conveniently ignores the fact that the permitting authority never had the opportunity to determine BACT for the Facilities precisely because Niagara Mohawk failed to follow the proper preconstruction procedures set forth in 42 U.S.C. § 7475(a).

■ Niagara Mohawk's initial failure to comply with the requirements of the Clean Air Act cannot now inure to its benefit. Acceptance of Niagara Mohawk's position that this suit is not authorized because BACT is not "in effect" would ignore, or worse reward, Niagara Mohawk's own failure to comply with preconstruction requirements. Permitting Niagara Mohawk to rely on its own inaction as a shield would lead to absurd and surely unintended results. *Cf. Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982) ("interpretations of a statute which would produce absurd results are to be avoided if

---

**22.** By its express terms, the 5–year statute of limitations in 28 U.S.C. § 2462 applies only to the State's action for "the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise." It does not bar pursuit of injunctive relief based on these otherwise out-of-time violations. *See Illinois Power,* at 957 n.

3 ("nothing in the Clean Air Act or 28 U.S.C. § 2642 precludes the Government from seeking injunctive relief beyond a five year statute of limitations"); *see also Westvaco Corp.,* 144 F.Supp.2d at 443 n. 2; *Campbell Soup,* 1997 WL 258894, at *3.

alternative interpretations consistent with the legislative purpose are available").

For example, under Niagara Mohawk's argument, a person who actually follows the mandates of the Act and has BACT determined for his facility, but then fails to implement or meet BACT, subjects himself to greater enforcement liability than a person, such as Niagara Mohawk in this case, that ignores the BACT determination requirement altogether. The citizen suit provisions of the Act cannot reasonably be construed to countenance such an inequitable result.[23] *Cf. New York State Comm'n On Cable Television v. Federal Communications Comm'n,* 571 F.2d 95, 98 (2d Cir. 1978) (courts may consider "common sense," purpose, and "the practical consequences of the suggested interpretations" in interpreting a statute). Accordingly, Niagara Mohawk's Motion to Dismiss the State's BACT claims on this ground is denied.

### b. BACT Violations As Independent Claims

The State alleges that the major modifications Niagara Mohawk instituted at the Facilities should have been subject to BACT for sulfur dioxide and nitrogen oxide emissions pursuant to 42 U.S.C. § 7475(a)(4). (Amended Complaint, ¶¶ 86–

87, 119–120, 153–154, 184–185, 215–216, 247–248, 277–278, 306–307, 337–338, 372–373.) The State argues that Niagara Mohawk's failure to subject the Facilities to BACT constitutes a separate (apart from the preconstruction permit requirement) violation of 42 U.S.C. § 7475(a) and 40 C.F.R. § 52.21. In opposition, Niagara Mohawk argues that failure to implement BACT is not a violation separate from failing to obtain a preconstruction permit.

Forty-two U.S.C. § 7475(a) sets forth eight conditions that must be fulfilled before a major emitting facility "may be constructed." One such condition is that a preconstruction permit setting forth emission limitations be obtained for the proposed facility, *see* 42 U.S.C. § 7475(a)(1), another is that the owner or operator of a proposed facility demonstrate that emissions from the modified facility will not threaten the area's attainment status, *see* § 7475(a)(3),[24] another is that the proposed facility be subject to BACT, *see* 42 U.S.C. § 7475(a)(4).

■ Contrary to Niagara Mohawk's argument, however, the seven additional requirements in 42 U.S.C. § 7475(a) are not subsumed by the initial requirement to obtain a preconstruction permit. Under the statutory structure of § 7475, the con-

---

**23.** This Court notes, without deciding, that 42 U.S.C. § 7475(a)(4) required that Niagara Mohawk's modifications to the Facilities be subject to BACT, whatever the permitting authority determined BACT to be. Thus, the *requirement* that the Facilities be subject to an emissions limitation or standard (*e.g.,* BACT) is certainly "in effect" for purposes of 42 U.S.C. § 7604(f). Given the remedial nature of the Clean Air Act, this may be enough to authorize suit under 42 U.S.C. § 7604(a)(1). This would also eliminate the illogical "loophole" presented here, that being that an alleged violator could rely on its own noncompliance with the Clean Air Act's preconstruction requirements to escape liability down the line. Under this interpretation,

the fact that the specific level of BACT had not been determined by the permitting authority would be irrelevant; the operative fact would be that the facility *is subject to* BACT pursuant to 42 U.S.C. § 7475(a)(4), which implicitly carries the requirement that BACT be determined.

**24.** The State also alleges that Niagara Mohawk violated the Clean Air Act by failing to demonstrate that the emissions increases resulting from its modifications would not threaten the area's attainment status pursuant to 42 U.S.C. § 7475(a)(3). (Amended Complaint, ¶¶ 79, 112, 146, 177, 208, 240, 270, 299, 330, 365.)

ditions under which a major emitting facility may be constructed are set forth as eight independent subparagraphs to subsection (a); the conditions are not contained as subparagraphs to existing subparagraph (1), which would indicate that the conditions fall exclusively under the permit requirement of subparagraph (1). *See* 42 U.S.C. § 7475(a).

Moreover, acceptance of Niagara Mohawk's argument that 42 U.S.C. § 7475(a)(1) encompasses the requirement that a facility be subject to BACT set forth in § 7475(a)(4) would make § 7475(a)(4) superfluous. Absent a clear Congressional command otherwise, statutes are not to be construed in "any way that makes some of its provisions surplusage." *Shore Realty*, 759 F.2d at 1044.

Thus, the requirement that a facility be "subject to BACT" is not duplicative of the requirement that a preconstruction permit be obtained. Rather, failure to subject a facility to BACT prior to construction constitutes an independent violation of 42 U.S.C. § 7475(a).

Not surprisingly, Niagara Mohawk cites no cases in which it has been held that *only* a violation of 42 U.S.C. § 7475(a)(1) may be pursued under 42 U.S.C. § 7475(a). On the other hand, courts examining similar BACT claims have held only that such violations do not create

continuing obligations or constitute continuing violations for purposes of the application of the statute of limitations. *See, e.g., Illinois Power*, at 957 (discussing failure to obtain a preconstruction permit and failure to install BACT as separate violations under 42 U.S.C. § 7475(a)); *Southern Indiana Gas*, 2002 WL 1760752, at *5 (discussing BACT as separate requirement); *Murphy Oil*, 143 F.Supp.2d at 1080–84 (similar). Notably, none of these cases dismiss BACT claims for failing to state a valid cause of action.

Accordingly, this Court finds that the State's BACT claims are viable. Dismissal on this ground is therefore unwarranted. However, the State's BACT claims are nonetheless subject to the 5–year federal statute of limitations applicable to the preconstruction requirements in 42 U.S.C. § 7475(a). As noted previously, the continuing violation theory does not save the State's untimely claims, including its BACT claims. *See Southern Indiana Gas*, 2002 WL 1760752, at *5; *Westvaco*, 144 F.Supp.2d 439, 444 n. 3. Thus, only the State's BACT claims falling within the 5–year statute of limitations period survive Niagara Mohawk's Motion to Dismiss.[25]

## 3. SIP Claims

Embedded in the State's federal allegations are nondescript state law violations

---

**25.** Once again this Court has considered Niagara Mohawk's argument that the State's BACT claims cannot stand because BACT is specifically defined as "an emission limitation ... which the *permitting authority*, on a case-by-case basis ... *determines* is achievable for such facility." 42 U.S.C. § 7479(3) (emphasis added). However, despite the fact that the permitting authority has not yet determined BACT for the Facilities (due to Niagara Mohawk's failure to comply with 42 U.S.C. § 7475(a)), the requirement that a facility be subject to BACT before construction or modification remains. The fact that BACT has not yet been determined is not, in and of itself, a reason for dismissal at this stage. Moreover,

while Niagara Mohawk argues that it would be improper for this Court to make the BACT determination (from expert testimony or otherwise), the State is not presently requesting that this Court assume that task. (*See* State's Memorandum in Opposition, pp. 15–16 ("The State is not asking the Court to impose particular technologies or emission limitations here; [the Department of Environmental Conservation] will make such determinations if the Court holds that defendants are in violation of the requirement to implement BACT.")). However, should the State's position change, Niagara Mohawk is free to renew its arguments on this point.

as well. It is unclear, however, which portion of the state SIP the State alleges is violated. In the first and second groups of allegations alleging federal violations for failure to obtain preconstruction permits and for failure to subject the Facilities to BACT, the State inserts, without elaboration, that this conduct also violates "related state law" or "NY SIP." From the tenor of the parties' pleadings, this Court assumes that the State is relying on state law provisions that simply mimic the federal ones expressly pled (42 U.S.C. §§ 7475(a)(1) and (2)). Like the federal claims, some of the companion state claims are susceptible to Niagara Mohawk's Motion to Dismiss on statute of limitations grounds.

For present purposes,[26] the parties agree that the State's SIP claims are governed by N.Y. CPLR § 214(2), which imposes a 3–year statute of limitations for any "action to recover upon a liability, penalty or forfeiture created or imposed by statute." This time bar applies both to the State's claims for civil penalties as well as for injunctive relief. *See, e.g., Hartnett v. New York Transit Auth.,* 86 N.Y.2d 438, 442–44, 633 N.Y.S.2d 758, 760–62, 657 N.E.2d 773 (1995) (applying N.Y. CPLR § 214(2) in the context of a labor case). As discussed previously in relation to the federal claims, this Court finds the State's continuing violation theory unpersuasive. Accordingly, Niagara Mohawk's Motion to Dismiss the state law SIP claims falling outside the 3–year statute of limitations period imposed by N.Y. CPLR § 214(2) is granted.

Moreover, the State has alleged separate violations of 6 N.Y.C.R.R. §§ 200.10 and 201. (Amended Complaint, ¶¶ 92–100,

125–133, 159–167, 190–198, 221–230, 253–261, 283–291, 312–320, 343–351, 387–394.) Six N.Y.C.R.R. § 201–1.2 provides as follows:

Unpermitted Emission Sources

If an existing emission source was subject to the permitting requirements of Part 201 of this Title at the time of construction or modification, and the owner and/or operator failed to apply for a permit for such emission source then the following provisions apply:

(a) The owner and/or operator must apply for a permit for such emission source or register the facility in accordance with the provisions of this Part.

(b) The emission source or facility is subject to all regulations that were applicable to it at the time of construction or modification and any subsequent requirements applicable to existing sources or facilities.

Prior to implementation of this section, 6 N.Y.C.R.R. § 201 required that any person who owned an air pollution source had to "operate and maintain such source or device in compliance with all applicable parts of this Chapter and existing laws." (Amended Complaint, ¶ 36.) While this Court acknowledges Niagara Mohawk's argument that dismissal of these claims is required because application of 6 N.Y.C.R.R. § 201–1.2 is impermissibly retroactive, this Court's task at this stage is not to examine the merits of the State's causes of action, but rather, it is to test the adequacy of the allegations as pled. Niagara Mohawk does not challenge the allegations as pled, and this Court detects no deficiency. Accordingly, Niagara Mohawk's Motion to Dismiss the State's

---

**26.** In the absence of authority from the New York Court of Appeals as to whether the State's enforcement of state environmental conservation laws is governed by N.Y. CPLR § 214(2), the State does not contest the applicability of the 3–year statute of limitations to its present state law claims. *See* State's Memorandum of Law in Opposition, at 41 n. 42.

causes of action expressly alleging violations of 6 N.Y.C.R.R. § 201 is denied.

#### 4. General State Law Claims

Niagara Mohawk requests that this Court decline to exercise supplemental jurisdiction over the State's remaining non-regulatory state law claims: common law public nuisance (Amended Complaint, ¶¶ 387–394), common law restitution and damages (Amended Complaint, ¶¶ 395–401), and violation of N.Y. Executive Law § 63(12)[27] (Amended Complaint, ¶¶ 402–406).

Pursuant to 28 U.S.C. § 1367(a), a district court has supplemental jurisdiction over all claims that form part of the same case or controversy as the claims over which the court has original jurisdiction. District courts, however, may decline to exercise supplemental jurisdiction if: (1) the supplemental claims raise novel or complex issues of state law, (2) the supplemental claims substantially predominate over the claims over which the court has original jurisdiction, (3) the court has dismissed the claims over which it has original jurisdiction, or (4) exceptional circumstances compel the court to decline jurisdiction. 28 U.S.C. § 1367(c).

This Court has reviewed and considered Niagara Mohawk's arguments regarding this Court's exercise of supplemental jurisdiction and finds them unpersuasive. First, it appears as though the facts underlying the State's non-regulatory causes of action are the same facts that constitute the case and controversy currently before this Court. *See Itar–Tass Russian News Agency v. Russian Kurier, Inc.,* 140 F.3d 442, 447 (2d Cir.1998). Second, this Court has not dismissed all of the State's federal claims. Third, it does not appear at this time that the State's non-regulatory claims predominate over the federal claims or raise novel and complex issues of state law. Therefore, this Court will refuse Niagara Mohawk's request to decline supplemental jurisdiction at this time.

#### 5. Restitution Claim

Finally, Niagara Mohawk argues that the State's claim for restitution for expenses it incurred in remedying damage to public property and in providing medical treatment to those adversely affected by Niagara Mohawk's and the NRG Defendants' violations of the Clean Air Act (*see* Amended Complaint, ¶¶ 395–401) must be dismissed for lack of proximate cause. In support, Niagara Mohawk relies on *Laborers Local 17 Health & Benefit Fund v. Philip Morris Inc.,* 191 F.3d 229 (2d Cir. 1999) and *Eastern States Health & Welfare Fund v. Philip Morris, Inc.,* 188 Misc.2d 638, 729 N.Y.S.2d 240 (2000), two cases in which the courts dismissed claims brought by union funds seeking recovery from the tobacco industry for the costs incurred by treating its members for tobacco-related illnesses. In those cases, dismissal was deemed appropriate because

---

**27.** New York Executive Law § 63(12) provides in pertinent part that the State Attorney General shall:

Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, to the supreme court of the state of New York, on notice of five days, for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages and, in an appropriate case, cancelling any certificate filed under and by virtue of the provisions of section four hundred forty of the former penal law [ ] or section one hundred thirty of the general business law, and the court may award the relief applied for or so much thereof as it may deem proper.

the chain of proximate cause stopped with the injured member of the benefit plan.

Those cases, however, involved union benefit funds seeking reimbursement for healthcare costs arising from members' tobacco use. They did not involve a State suing to recover costs expended from the public treasury. Recognizing that States may possess "unique quasi-sovereign rights," the Second Circuit noted that "state cases are often distinguishable on the issue of proximate causation given the state's unique role relative to protection of its citizens ...." *Laborers Local 17,* 191 F.3d at 243–44. While Niagara Mohawk correctly points out that these comments are dicta and the Second Circuit specifically noted that it had "no reason to pass" on the issue, *id.* at 244, this Court cannot ignore the Second Circuit's statements on this issue and conclude, as a matter of settled law, that the State can prove no set of facts in support of its claim that will entitle it to relief. *See Cohen,* 25 F.3d at 1172. Accordingly, Niagara Mohawk's Motion to Dismiss on this ground is denied.

## B. The NRG Defendants' Motion to Dismiss

Despite being faced with what appears to be an issue of first impression, resolution of Niagara Mohawk's Motion to Dismiss makes adjudication of the NRG Defendants' motion a simpler task. In no aspect of this case are the distinctions between the Clean Air Act's construction permit and operation permit programs

more critical than in the NRG Defendants' Motion to Dismiss. *Compare* 42 U.S.C. § 7475, *with* 42 U.S.C. § 7661 *et seq.*

### 1. Federal Claims

■ As thoroughly discussed above in relation to Niagara Mohawk's statute of limitations argument, violations of the preconstruction requirements at 42 U.S.C. § 7475(a) are singular violations that occur at the time of construction. *See Illinois Power,* at 954–57; *Southern Indiana Gas,* 2002 WL 1760752, at *5; *Murphy Oil,* 143 F.Supp.2d at 1083–84; *Westvaco Corp.,* 144 F.Supp.2d at 443–44; *Brotech,* 2000 WL 1368023, at *3–4; *United States v. Campbell Soup Co.,* No. CIV–S–95–1854 DFL, 1997 WL 258894, at *1–2 (E.D.Ca. Mar. 11, 1997). Each requirement contained in 42 U.S.C. § 7475(a) applies *prior to* construction or modification of a facility, and does not constitute a continuing obligation or violation. *Cf. Illinois Power,* at 955–56 (noting that "[p]reconstruction permits have a finite existence while operational permits can be ongoing violations"). Finally, there is no liability under the preconstruction provisions for *operating* a facility in violation of the preconstruction requirements. *Compare* 42 U.S.C. § 7661a (making it unlawful for any person *to operate* a major source except in compliance with a permit issued by a permitting authority).

■ By its plain terms, 42 U.S.C. § 7475(a) does not impose liability on any person other than the one who fails to comply with its requirements.[28] Precon-

---

**28.** Because this Court finds dismissal appropriate under the plain language of 42 U.S.C. § 7475(a), it need not fully address the NRG Defendants' arguments comparing § 7475(a) to other provisions of the Clean Air Act. However, this Court notes that in the nonattainment provisions of the Act, Congress specifically included "construction and operation" in the permitting procedures for new and modified major stationary sources. 42 U.S.C. § 7502(c)(5) ("Such plan provisions shall require permits *for the construction and operation* of new or modified major stationary sources anywhere in the nonattainment area ...."). Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts inten-

struction obligations are imposed only upon the person who actually seeks to construct or modify a facility within the meaning of the Act. *See* 42 U.S.C. § 7475(a). For example, 42 U.S.C. § 7475(a) provides requirements that must be met prior to construction or modification being commenced. The term "commenced" is defined at 42 U.S.C. § 7479(2)(A) and, as applied to construction of a major emitting facility, means

> that the *owner or operator* has obtained all necessary preconstruction approvals or permits required by Federal, State, or local air pollution emission and air quality laws or regulations and either has (i) *begun . . . construction* of the facility or (ii) entered into binding agreements . . . to undertake a program of construction of the facility. . . .

(Emphasis added.) It is simply counterintuitive to construe the Clean Air Act in such a way as to impose liability for failure to follow the Act's preconstruction requirements on a person for whom compliance would have been impossible. The State cites no cases standing for this proposition, and this Court has been unable to find any.

Here, there is no dispute that the NRG Defendants neither owned nor operated the Facilities at the time the modifications allegedly occurred. (Amended Complaint, ¶ 13.) The NRG Defendants are after-the-fact, third-party purchasers. Hence, the NRG Defendants had neither the obligation nor the ability to comply with the mandates of 42 U.S.C. § 7475(a).[29] Even assuming the truth of the allegations contained in the Amended Complaint, that is, that the Facilities were modified without fulfillment of the preconstruction requirements, 42 U.S.C. § 7475(a) does not give rise to a cause of action against the NRG Defendants. Accordingly, the NRG Defendants' Motion to Dismiss these federal claims (and the state law claims to the extent that they mirror 42 U.S.C. §§ 7474(a)(1) and (4)) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted.[30]

### 2. Remaining State Law Claims

In the absence of federal claims, this Court declines to exercise supplemental jurisdiction over the State's remaining state law claims against the NRG Defendants and will therefore dismiss them without prejudice.

> It has consistently been recognized that pendent [or supplemental] jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate

---

tionally and purposely in the disparate inclusion or exclusion. *See Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983); *Smaldone v. Senkowski*, 273 F.3d 133, 137 (2001) (per curiam).

**29.** This Court notes, however, that the NRG Defendants currently operate the Facilities under operating permits issued by the State. Moreover, the NRG Defendants are subject to numerous other state and federal programs governing pollutant emissions. Thus, while the current claims against the NRG Defendants are dismissed, it is important to note the NRG Defendants remain subject to other environmental regulation.

**30.** The NRG Defendants also argue that dismissal is appropriate pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. However, this Court clearly has subject matter jurisdiction over the State's claims brought pursuant to the federal Clean Air Act. It is the State's failure to state a claim upon which relief may be granted, not a failure of jurisdiction, that compels dismissal. For a good discussion of the distinction between these often confused concepts, see *Carlson v. Carlson*, 320 F.3d 301, 305–08 (2d Cir.2003).

to exercise jurisdiction over state claims, even though bound to apply state law to them .... Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218, 228 (1966) (internal citations and footnotes omitted).

Just recently, the Second Circuit reversed a district court's assumption of supplemental jurisdiction over state law claims after the federal claims were dismissed. In *Valencia v. Lee,* the district court retained jurisdiction over an action seeking recovery on behalf of an infant on the theory that New York State had created a special relationship with the infant and failed to protect him from the ill-effects of lead paint. 316 F.3d 299, 304–306 (2d Cir.2003). At the conclusion of pretrial discovery, counsel for the Plaintiff conceded that he could not prosecute his federal claims, but pressed the Court to retain jurisdiction over his state law claims. The district court did so, but was subsequently reversed.

In surveying its jurisprudence in this area, the Second Circuit noted that, in the usual case where all federal claims have been dismissed before trial, the balance of factors to be considered in whether to retain jurisdiction over state law claims

include judicial economy, convenience, fairness and comity. *Valencia,* 316 F.3d at 305 (citing *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). The Court further noted that it has found abuse of discretion in situations where district courts have exercised supplemental jurisdiction over state law claims involving unsettled issues of state law in the absence of federal claims. *Valencia,* 316 F.3d at 306 (citing cases).

 Upon careful consideration this Court finds that the factors identified in *Cohill* and reiterated in *Valencia* would not be served by this Court's exercise of supplemental jurisdiction over the State's remaining claims against the NRG Defendants. For example, this litigation is in its infancy, a factor keenly noted in *Valencia* as weighing against supplemental jurisdiction.[31] Moreover, there has been no discovery and no protracted pretrial litigation. The facts pertaining to the State's claims against the NRG Defendants do not appear to overlap in any way with those against Niagara Mohawk: there are two separate and distinct periods of ownership. Finally, judicial economy and convenience are not served by including the multiple NRG Defendants in what this Court anticipates will be already complicated litigation between the State and Niagara Mohawk. Accordingly, this Court declines to exercise supplemental jurisdiction over the State's state law claims against the NRG Defendants. Those claims are dismissed without prejudice.[32]

---

**31.** In *Valencia,* the Second Circuit determined that despite the completion of pretrial discovery, the litigation was still at a relatively early stage. Here, declination of supplemental jurisdiction is more compelling because the parties have not even commenced discovery.

**32.** It is important to note that this Court's decision not to exercise supplemental jurisdiction over the State's state law claims against the NRG Defendants is not inconsistent with its decision to exercise jurisdiction over the State's state law claims against Niagara Mohawk. Importantly, federal claims remain against Niagara Mohawk and the same set of

## IV. CONCLUSION

Consistent with this Decision and Order, Niagara Mohawk's Motion to Dismiss is granted in part and denied in part. The portion of its motion seeking dismissal of the State's claims alleging violations of 42 U.S.C. §§ 7475(a)(1) and (4) and the comparable N.Y. SIP provisions falling outside of the 5–year and 3–year federal and state statutes of limitations periods is granted. In all other respects, Niagara Mohawk's Motion to Dismiss is denied. The NRG Defendants' Motion to Dismiss is granted in its entirety.

## V. ORDERS

IT HEREBY IS ORDERED, that Niagara Mohawk's Motion to Dismiss (Docket No. 9) is GRANTED in part and DENIED in part.

FURTHER, that the NRG Defendants' Motion to Dismiss (Docket No. 6) is GRANTED in its entirety.

FURTHER, that the State shall file with the Clerk of the Court and serve a Redacted Amended Complaint in conformity with this Decision and Order within thirty days from the date that this Decision and Order is filed. The State shall set forth no new allegations without leave of this Court.

FURTHER, that Niagara Mohawk shall file with the Clerk of the Court and serve a Redacted Amended Answer to the Redacted Amended Complaint.

FURTHER, that upon Niagara Mohawk's filing of its Redacted Amended Answer, this Court will schedule a status conference for the purpose of discussing the parties' positions regarding whether

this case should be stayed pending further administrative review.[33]

SO ORDERED.

---

operative facts underlies both the federal and state law claims lodged by the State. The same cannot be said about the NRG Defendants.

**33.** Niagara Mohawk has suggested that such a stay may be appropriate. *See* Niagara Mohawk, Reply Brief, p. 15; Niagara Mohawk, Supplemental Brief on Recent EPA Announcement, ¶ 1.